The Honorable Judges of the United States Court of Appeals in and for the Session of the Judicial Circuit. Hear ye, hear ye, hear ye. All Presidents having business before the Honorable Court are admonished to draw near and give their attention as the Court is now sitting. God save the United States and our courts. Good afternoon, everyone. We're here on Appeals 243248 and 243249, LSP Transmission Holdings II v. Northern Indiana  Public Servic The Honorable Judges of the United States Court of Appeals in and for the defendant intervenors. Thank you, Your Honor. I'd like to reserve a few minutes for a moment. MISO's FERC-approved tariff requires it to honor state roofer laws. Plaintiffs are concerned or were concerned that MISO would abide by its own tariff by honoring Indiana's roofer law. But instead of suing MISO, who they conceded at oral argument before this court at the stay, is the only party that actually enforces the roofer, they sued the IURC, hoping to obtain an advisory opinion that would convince, they would hope, MISO to no longer honor its own tariff. Now that is wrong for several reasons. First, it is wrong as a matter of Article 3 standing and the equities, because their entire thesis was that, in their words, MISO would respond predictably to a PI issued against a non-party by no longer honoring its tariff. We know now from MISO's amicus brief that that thesis was untrue. But it was also problematic for the following reasons. Plaintiffs' argument, boiled down to its essence, is that MISO's tariff violates the Dormant Commerce Clause. The reason for that is that the law here only has operation and only has meaningful impact, insofar as it informs what MISO will do under its tariff. And of course, MISO's tariff can't possibly violate the Dormant Commerce Clause, because MISO's tariff was approved by FERC under its power, given to it by Congress, under the Federal Power Act. Now I will, of course, want to primarily lead with the threshold issues, but in thinking about this last point, there was kind of a light bulb moment for me that I really wanted to lay out for the Court. It is my friend's position, I take it, that before Order 1000, when MISO's tariff essentially required each state to have a roofer, that did not violate the Dormant Commerce Clause. But their position is that after Order 1000 and the amendment of that tariff, the fact that MISO and FERC gave states the option, do you want the old regime or do you want the new competitive regime, that choice was somehow unconstitutional, such that every state has to now be in the competitive regime. And it gets even more bizarre still. Are you sure that in the pre-Order 1000 era, that states were compelled to have a right of first refusal in the state statute? Not by the state statute, but... No, no, no, that at the federal level, states were compelled to include them in state law? Not that they were included in state law. The state law was irrelevant. The MISO tariff, which governed the transmission bill projects, mandated a roofer. It would just go to the incumbent. There was nothing the state could do about it. Just like the state can't do anything now about the right-sizing roofer, about the upgraded roofer, and things of that sort. And then the position becomes even more bizarre still if you think about the following. Let's say in response to Order 1000 and the amended FERC tariff, every state in the MISO region said, we want the old regime, and they all adopted state roofers, so that the world was exactly the same as it was before Order 1000. They would say, every one of those state roofers is unconstitutional, and everyone has to have competitive bidding. There is nothing in the implicit dormant commerce clause or any doctrine that requires that bizarre result. But, of course, there is an easier way to dispose of this case, which is that they sued the wrong party. And the way that I would like to break that discussion down for the court is first, why the preliminary injunction is obviously out the window in light of the MISO amicus brief, but further, why this court should go further and say that the entire case must go. Now, with regard to the preliminary injunction, I think it's fairly straightforward. Their entire theory of standing and their entire theory of curing their ripple harm was that they predicted that MISO would respond to an injunction against a non-party by no longer honoring the roofer. We now know that that is not true. MISO said, and I'm just going to quote these words because you can't get much clearer than that, the preliminary injunction order has, quote, no impact or effect on MISO or its actions, whether past, present, or future. That's like the most clear statement imaginable of having no impact. Do you believe LSP could have sued MISO? They certainly could have challenged MISO. We think the proper place to do that would be before FERC. Could they have sued MISO in the federal district court? We don't think so. We think that the proper way to proceed would be to go to FERC. In FERC, they could raise both the constitutional objection to the MISO tariff, which I think wouldn't go very far for the reasons I was explaining, and they could also raise the interpretive issue. Why do you believe that the answer is no to they could not sue MISO in a federal district court? Because their challenge ultimately boils down to a challenge to MISO's tariff, and that's a FERC-approved tariff, and the way that the statutes relating to FERC work is you go to FERC first. But, of course, you get a federal forum eventually. You go to FERC. You can ask it to do an expedited proceeding. You can file your complaint, and you can ask it to do an expedited proceedings, and then if you lose before FERC, then you've got the option to come to either this court or the D.C. Circuit if you lose. So you do have to go through the FERC process before FERC can give you relief, and you're not denied an Article III forum eventually after you go through the administrative process, and that also makes sense just as a matter of other doctrines like primary jurisdiction. Since you're dealing with the meaning of a FERC-approved tariff, you wouldn't make any sense to go to federal court where the federal court would have to then go ask FERC what the tariff means under the primary jurisdiction doctrine. So for those reasons, I think the P.I. is out, but I also think that even if Your Honor agrees with me that the P.I. question is now a pretty easy one, the court should go further and make clear that there's no standing here at all. Even if they get the final judgment that they want, it is entirely speculative what impact that will have on MISO. I thought MISO was telling us that at least a final judgment from a court of last resort, in effect, is something that they would abide by. I mean, that's the position they extrapolated from a footnote in MISO's amicus brief. Well, I've extrapolated it too. Well, I mean, I think it's pretty useful to compare the language that I just read about what MISO said about the P.I., which is, quote, no impact effect on MISO or its action pattern in the future. And what they say in that footnote, which is, in another case, we did the following. Now, I do not say that how MISO will ultimately react to a final judgment is as clear as how they will react to a P.I. I think it's genuinely uncertain, and I think it's genuinely uncertain how FERC will ultimately adjudicate that. What do we do with the fact that FERC seems to both bless these state law rights of first refusal but to say we aren't saying anything about their constitutionality? Yeah, well, it wouldn't make sense for it to say anything about the constitutionality of it because the entire Dormant Commerce Clause analysis only applies when the action is not already authorized by state law, by federal law. By approving the MISO tariff and making it federal law, FERC was saying, under its power, under the Federal Power Act, that that choice that the state can make is authorized by federal law. It would be as if Congress enacted a statute that said states can choose the ROFA regime or the competitive regime. It's your choice. I understand that it is a regulation or it's like a derivative regulation because it's a tariff approved by FERC, but as a formal matter, as the way administrative agencies can operate, they can only operate under explicit authorization from Congress. So it is assuming that the MISO tariff is properly authorized by the Federal Power Act, and that MISO tariff specifically authorizes Indiana to make the choice to choose the pre… How does that satisfy a clear statement rule, though? Because you have, most recently, maybe there's something more recent, but if there is, I can't find it. You have, in 1992, in the Wyoming case, you have a clear statement requirement, and the clear statement is not from an agency that has an enabling statute that may enable what you've just described. Rather, it's focused on the actions of the U.S. Congress. I think the clearest refutation of that thesis is the White case from the U.S. Supreme Court, 460 U.S., 204. Yeah, what do you do about the two cases after White? So that's been briefed, and I've looked at it, but after White, you have Wyoming v. Oklahoma in 1992, and you also have South Central Timber in 1984. Yeah, so… So, maybe you're going to say I'm wrong to be looking at the most recent U.S. Supreme Court precedent, and if that's mistaken, what do you recommend we look at? No, I think none of those cases at all deal with the situation here, which is, it's not that the state has a standalone ROFR that is blocking some sale. This is a state saying, this is a choice that federal law gives me, and by federal law, I mean the MISO tariff. We're choosing the path, one of the two paths that is allowed by the federal law, which is the MISO tariff. This is not, you know, let's say the MISO tariff was phrased the following way. Rather than passing a law through a legislative process, what a state had to do to opt into the pre-Order 1000 regime was just send a certification from the governor to MISO. Treat us like it was pre-Order 1000. That's the choice that the MISO tariff, which is federal law, gives it. I don't think there would be any argument that by just sending that certification, opting into that old regime, that would somehow implicate the DOMER clause at all. But that is all that the MISO tariff here does. The statute that they are challenging, or at least this part of the statute, has no operation, no import, nor meaning, except to the extent that it triggers the choice that was given to the state by federal law through MISO's tariff. It has no other meaning, no other import. Through an administrative agency, right, interpreting its organic statute to, as Judge Hamilton said, you know, bless, approve, accept, tolerate, whatever you want to, however you want to phrase that. It might be, and they could argue that, you know, after Loper-Bright, that Order 1000 or the MISO tariff is not valid under the Federal Power Act. But to the extent that it is, then it's just like this court's Starr decision, which came after the Supreme Court decisions they cite, which is – and this is the quote from Starr. This would amount to saying that powers reserved to the states by the Federal Power Act are denied to the states by the Constitution. That cannot be. If the Federal Power Act authorized MISO through FERC to give the states this choice, if Order 1000 is lawful under the Federal Power Act, and if the MISO tariff is lawful under the Federal Power Act, then the choice is a federal choice given to the states, and a federal choice given to the states can't violate the Domers Commerce Clause. We've got the White case and the Marion versus the Apaches case, which both expressly address administrative agencies blessing allegedly unconstitutional policies. In Wyoming or the South Central Timber cases, was there any issue about federal agency approval? No. I think those cases are cited for a different proposition, which is their broader principle that nothing in the Federal Power Act can ever be relevant for a Domer Commerce Clause analysis. So in those cases, the court did not have reason to focus on the issue it addressed in White and the Marion cases about agency approval being sufficient. That's exactly right, Your Honor, and I think the White case is particularly on point. There you had a local order saying half the workforce had to be in Boston, and it was funded by federal money, and it was just a regulation, so that was fine. This is even more explicit. This choice is only put to the states because of what the new MISO tariff tells them is their choice. They're just telling them they can opt into the old regime if they wanted. It's a measure of respect to the states. It's a greater respect to the states than the prior regime where the states were all forced into the ROFR system, and their thesis is that under the Domer Commerce Clause, you could force the states essentially to all have ROFRs. Can I ask you, we've got a lot of policy debates about these rights of first refusal versus competitive bidding for the big interstate transmission projects. We have your side arguing this is critical for reliability. I guess I wonder if it's so critical for reliability, why is it just an option for the incumbent rather than a mandate to the incumbent to do the construction? Well, I think it's fair to say that Order 1000 started an experiment. When you do an experiment, sometimes you can just be like, hey, we used to have mandated ROFRs. Now we're going to switch to no ROFRs for anyone. What it said was we're going to honor states' historical authority over construction and siting by giving them a choice, and we're going to let this natural experiment play out. Does it work? So far, I think it's working pretty poorly, notwithstanding the views of the FTC, to the point where FERC is adding new federal ROFRs, considering whether to get rid of the limited ROFRs that do exist. So maybe the equilibrium will rest currently where it is, which is state discretion, or maybe it will ultimately go back to the old regime or some modified version. Certainly, there's some wisdom in the current regime, where for Indiana's franchise utility model, the ROFR works really well. Different states might try out different ways to provide electricity to their citizens. Maybe a ROFR works less well there. And the principle that Order 1000 operates under is respect to the states. It's giving the states a choice. And again, as I said, it's quite strange to say that it is totally fine from a constitutional perspective to force a ROFR on all the states. But to give the states a choice whether they want a ROFR, somehow, under federal law, somehow violates the Dormant Commerce Clause. And further, if we give all the states a choice, and they all say, no, we like the old ROFR regime, then all of those are unconstitutional. That just can't be. And no Supreme Court case or any other case that they cite suggests anything like that. If I could reserve the balance of my time for rebuttal. OK. Mr. Stateland. Yeah, no problem. Ms. Lawrence, nice to see you. Go right ahead. May it please the Court. At every step of this case, IURC has argued that plaintiffs lack standing. Plaintiff's concern is with MISO's actions awarding MISO projects under MISO's tariff. Those concerns should be handled before FERC or with the proper parties before the Court. In the briefing as we've been talking today, I think it might be helpful to take a step back to talk about what IURC's role is in Indiana and in regulating utilities there, particularly in the electric transmission situation. So IURC's job is to provide safe and reliable service at just and reasonable rates to ensure that that is what rate payers in Indiana receive. So when you look at SB 1420 and see what is IURC's role there, it makes sense that those twin goals, safety and reliability, and prices to rate payers, how that comes out in the statute. So, for example, that means that IURC receives notices if someone is going to exercise their right of first refusal. And as we've talked about before, when they receive that notice, IURC doesn't take any action. They receive that notice. Part of that is so that they're aware when situations arise. They get a phone call. Someone says, hey, there's a transmission company that's cutting down trees in my backyard. What's going on? That they know who to talk to. Let me interrupt you here because if, would we be zany if we saw some tension here? Because IURC is telling us we don't enforce the law. We have this notice capacity. MISO over there is saying we don't enforce the law. Who enforces this law? And, you know, is your argument that we really should not care in order to make the decision that we need to make here? Well, first of all, Your Honor, I would never say that this court is zany in any tact that it takes. Good tactic. I think there's a couple different things that are involved in that question. So, there's one question of if you want to challenge this law, who do you sue and where do you do it? And that's the plaintiff's responsibility to show that they have sued the correct person in the correct forum. Secondly, the place to look at whether FERC's tariff, whether MISO's tariff with FERC is appropriate and constitutional would be in front of FERC. And to actually examine FERC and allow FERC to make a determination in the first instance. So, I hear what you're saying. Let me imagine a hypothetical here. Let's suppose the district judge thinks she's got standing, she's got jurisdiction. She issues a final declaratory judgment against the URC commissioners without MISO being a party. But a final judgment on the merits. This is unconstitutional. This court affirms. Supreme Court denies cert. And MISO says, we don't care. We're not parties to this. Nobody's enjoining us. We're sticking to our tariff. We interpret it to mean that we get to decide. Actually, I want to flip this around. I asked this improperly. Suppose MISO were to decide it's going to refuse to recognize rights of first refusal for some reason. And it competitively bids awards to one of the plaintiffs, one of these construction awards. And then, would the IURC be able to deny or prohibit construction of that line? No, Your Honor. Why not? The IURC would not. They don't have the authority to. They've got authority over siting and construction, right? Well, in Indiana, in some places, the municipalities have authority over that. But they have authority over ensuring that there's compliance with certain safety regulations. And then also that when utilities come in and say, we want to pass these costs on to consumers, whether they've complied with the applicable statutory rules for subcontracting and stuff like that. I think it's helpful if we look actually at both the Texas ROFR law and the Minnesota ROFR law. Can you hold on just one second on that question? So suppose – I know this is not the outcome you want. I just want you to assume that the U.S. Supreme Court concludes that the Indiana statute is unconstitutional. Your position is at that point in time, the Indiana Regulatory Commission would allow a shovel to go into the ground? I'm sorry? You would allow construction to go forward? Construction's not started. There's litigation going on. There is a final judgment entered. That's not his – that's what I'm asking you. I'm changing it around a little bit to go back. So to make sure I'm understanding, what you're saying is that if MISO has awarded – I'm not worried about MISO at all. Okay, MISO does what it does. In the course of this litigation, though, there is a final judgment entered that the Indiana statute violates the Dormant Commerce Clause. If that's the case, you would still – the Regulatory Commission would still say, yeah, but the right of first refusal was in place previously. A contract was awarded to an incumbent at a time where we really weren't having anything to do with this because that's MISO, that's not our role. When it came time for the construction to begin, you would say, go ahead. IURC wouldn't have any enforcement authority to do anything there. That's – IURC is a passive observer to how MISO awards its awards and who receives those contracts. And once again, this is the step back of if that was an issue where someone is building something under a MISO award that MISO issued for the sake of this hypothetical in contravention of its tariff, then that's an issue that goes before FERC. That's not an issue that IURC plays a role in enforcing here. And again, I also want to be very careful about committing what exactly would happen if we were in all these situations. It seems very odd to me to say that the states, including Indiana, that the states have authority under the Federal Power Act, under the so-called Savings Clause, to engage in construction or to regulate construction and siting to oversee those things. But yet when it actually comes down to overseeing construction, it has no authority whatsoever. Well, and let me be clear, Your Honor. I'm saying that IURC would not have authority there. I'm not saying that there's no state entity that might have authority. Well, that's why I began with who. Yeah, who would it be? Who else? Like Marion County or somebody? Well, this once again goes back to the plaintiff's responsibility. We understand it's the plaintiff's responsibility, but it's also your job to help us understand how the system works. And it's a little hard to imagine at least a colorable Commerce Clause claim that doesn't have a proper defendant. Well, so, Your Honor, in answer to the first part of that, who actually is dealing with the siting? In Indiana, it's municipalities that does the siting and particular building permits. But this is where I think it's helpful, again, to look at that Minnesota and Texas law. Because in both of those cases, you know, when we were here last time, plaintiffs suggested we always sue the Utility Commission. I don't understand why it's a problem here. It's because Indiana's law is different. So in Texas, when the Utility Commission was – they were involved in the process. Yeah, I don't want to use our time with Texas and another state because it seems very – I thought what you were going to say in response to this is I'm not sure. And the reason I'm not sure, if we go to the ultimate question of would you allow construction to go forward, we've never been there before, right? If we're not there right now, that is completely unchartered territory. You're talking about an awful lot of disruptive activity that would occur between now and then. I just don't know. But it seems very odd to me to read the Indiana statute, conclude that it does give the Regulatory Commission authority over siting and construction, and then to say in the next breath, but the Regulatory Commission could not do anything about unconstitutional construction. I want to be clear, Your Honor. That's odd. We don't know because there are a lot of facts that we don't know in this situation, in the hypothetical that's been presented. But I think that goes back to the issue of who can stop the harm the plaintiffs are alleging right now. Yeah, fair enough. We definitely have to consider the posture. That's all fair. But we also – we have a complaint in front of us that has challenged the statute constitutionally, right? And it happens to take on a preliminary posture in the form of this preliminary injunction and what have you. But if you think about a final judgment being entered ultimately, whether it's declaratory or otherwise, I just have a hard time reading the Indiana statute to conclude that the Regulatory Commission is 100% powerless, that it could care less what the Seventh Circuit says, could care less what the Supreme Court of the United States says. It will allow construction to go forward. If I may, Your Honor. Please. To be clear, the IURC certainly cares what the Seventh Circuit and the Supreme Court of the United States would say. But what we've said is that right now there's an injunction that stops IURC from enforcing the law. And there's no action that IURC takes right now that enforces the law. That's what we're saying right now. Okay. So is that to say you're not taking a position on anything broader than that? Because I'm trying to play it out down the line. I totally understand the position. I get it. We're here on a preliminary injunction. What about a final judgment? It would depend, Your Honor. It depends on the facts, the situations, and what the specific final judgment says. But IURC does not have enforcement authority for this right of first refusal law. Okay. Thank you very much. Ms. Murphy. Thank you, Your Honors, and may it please the Court, Aaron Murphy on behalf of the appellees. I've heard some arguments this afternoon that have left me a little bit puzzled because they seem to rest on some premises that are not really correct about what we're arguing and what we're challenging here. So I want to start by being very clear about that. This is not a dormant commerce clause challenge to MISO's tariff. It couldn't be a dormant commerce clause challenge to MISO's tariff because MISO's not a state actor who's bound by the dormant commerce clause. And neither is FERC, which is why, sure, FERC can have rights of first refusal to its heart's content because FERC doesn't have to follow the rule that states can't discriminate against interstate commerce. But if you want to have a state law that gives a right of first refusal, that is subject to the dormant commerce clause restrictions that apply to states, to municipalities, to the actors that are actually bound by the dormant commerce clause. And that is what FERC itself has recognized. It said in its brief before this Court, we're not taking any position on whether these state laws violate or are consistent with the dormant commerce clause because that's not our role, that's not our question. FERC certainly took a position on whether they're preempted, but it made clear. It has never suggested that it has empowered states to enact laws that violate the dormant commerce clause. To the contrary, it basically allowed MISO and other RTOs and ISOs to put into their tariff provisions that say, look, we're going to take state law as we find it as long as it's applicable, which MISO has admitted, we think in footnote 11 of its brief here, but certainly clearly in its Iowa litigation, its amicus brief in the Iowa litigation, depends on whether a state law is constitutional. And so MISO agrees with us as a general matter that if there's a final judgment that says that a state law is unconstitutional and cannot be enforced, then MISO is bound as a matter of its tariff not to apply that law. What you're referring to is what MISO calls its variance analysis, that at the end of the day when all the preliminaries are done, if there's a final judgment, they may, I mean this is a big if, if you prevail, they'd have to go through this variance process. Well, what they would have, what they'd have to, so there's kind of two things going on. One, on a going forward basis, they cannot apply this law. If we have a final judgment, I think they've been quite clear about that. If we have a final judgment, like set aside 2.1 for now, future projects, this law is out. And so that goes to show that, you know, I think. What about as to the past? So as to the past, then you would have, I mean, I think there's a two-part dispute. First, we don't think these, we're not even sure these projects have been assigned, but to the extent they have been, we believe they've been assigned in violation of MISO's tariff. We have the right, as MISO admits and as appellants agreed in their reply brief, to file a petition before FERC arguing that. We're preparing that right now. We will be filing an emergency expedited petition with FERC arguing that MISO is presently in violation of its tariff because notwithstanding its views that preliminary injunctions are somehow radically different from permanent ones, you know, we think the better reading of their tariff is they all count and render a law inapplicable. And we also, I think this is common ground among everyone, we agree that that's a dispute that we have to take before FERC in the first instance because that's a dispute about the terms of its tariff. That's not what this litigation's about. We aren't here because we have a dispute, I mean, we now have a dispute with MISO about their tariff, but we didn't bring this lawsuit because we had a dispute with MISO. On this proper party business that we've been talking about for a couple of arguments now, in the argument that we had in December, Ms. Murphy, you said, well, we, I don't, this is my paraphrasing. You said, well, we could have sued MISO, but I can tell you what would have happened. MISO then would have stood on the sidelines and said we didn't enact the state law, we don't have, you know, a dog in that fight or however they would have put that. Okay. I have been very much stumbling on how MISO could be sued as a defendant in a federal district court. What's that, on what claim and under what cause of action, how would that work? Your Honor, that's precisely why we didn't sue MISO. I'm not here to disavow the notion we can because if this court tells us we have to sue MISO, we'll sue MISO. But we didn't like just make a mistake. We thought about this. We understood MISO's relevance. It becomes a little bit of a law school lecture, but I don't understand how they're a proper 1983 defendant. I don't understand an allegation that they're in a conspiracy with a state actor, that they're an arm of the state, that there's some kind of ex parte young thing with them. I don't, I can't identify a basis to sue them. I've struggled quite a bit with that myself. I don't think there's a basis to bring a district court action against them. And we don't really have a beef with MISO unless and until we obtain a determination that Indiana's law is unconstitutional. Because MISO's not violating its tariff until there's a determination that this law is not constitutional and it's not enforceable and it's not applicable. So for us to sue MISO and say, hey, you know, we think this law is unconstitutional and we think that you're going to apply it anyway, and we want to enjoin you from applying it when no court has yet held that it's unconstitutional, we would have been putting, at the very least, putting the cart before the horse. So do you take no issue with MISO's brief? Do you see a role for a preliminary injunction to have an effect on MISO here, for example, because preliminary injunctions can cover agents that are acting in concert with or in participation with? Do you have some sort of theory that MISO is acting in concert with or in participation with the relevant authorities here? So we absolutely take issue with that part of MISO's brief, that preliminary injunctions don't count. But our argument is, so what matters? And MISO, you know, this is common ground. What they're saying all throughout their brief is we're bound by our tariff, and our tariff tells us we have to follow applicable laws. And I take them to concede that a permanent injunction renders a law not applicable. Their only argument is we don't think a preliminary injunction has the same force. So they're accepting the basic construct of our litigation, which is the ultimate relief we want in this litigation will remedy our injury, because MISO will no longer apply this law if we get a final judgment. They're just disputing whether the preliminary injunction has the same force. And on that issue, that's the issue that they do acknowledge in their brief. It's just a dispute about how their tariff is applied. And we, in the supplemental filing we submitted on Friday, explained that, you know, if the question is whether a law is applicable, a preliminary and a permanent injunction have the exact same force. They have the same effect. The law cannot be applied while a preliminary injunction is in force. Yeah, it's temporary, but the whole point of an injunction, whether it's preliminary or permanent, is that it renders, you know, the action. You can't take the action. You can't apply the law. You can't enforce the law. So that's what we're going to go argue before FERC, and we're going to argue to FERC that MISO has just really badly misinterpreted its tariff on this distinction. Suppose, Ms. Murphy, that another competitor like LSP had brought suit in the Northern District of Indiana seeking a similar sort of preliminary injunction. At the same time, all of these 2.1, Tranche 2.1 projects, and it was denied there. We've got two district judges, different views on preliminary relief. Yeah. What's MISO supposed to do then? You know, I mean, I think it probably is something that ends up having to go be disputed before FERC because it's a dispute about what their tariff. I mean, you know, their tariff does not address by its terms what to do with preliminary orders. And I think that, you know, the way one of those laws would have, if you were talking about a scenario where you had two different courts in Indiana, one that enjoins the commission and one that doesn't enjoin it. I mean, the commission is enjoined vis-a-vis the one court. I guess maybe it's enjoined only as to a certain section of Indiana. Okay. Imagine the Northern District issues an injunction saying the IURC must enforce it. Saying... Must enforce the... Must enforce the statute, you know? I mean, I think ultimately, like, whatever injunction is kind of enforced is the one that's going to, if it's something that purports to be across the state and you have two different competing district courts, then obviously this court's going to have to resolve that really quickly, you know? But that's a situation that I don't think is sort of unique to or a reason to ignore MISO's tariff or deprive us of the ability to go litigate before FERC the dispute about what the effect of the preliminary injunction is. Is there any doubt that FERC has the power to recognize state rights of first refusal like this? Yes. We actually have an argument pending in our complaint below that these laws are actually preempted by the Federal Power Act. That's not before this court right now because we didn't seek preliminary... And that sounds like something that we decided in 2016. All I would say is I think we can leave that issue to our next round of appeals in this case since we haven't had an opportunity to brief and argue the preemption question. Let's assume for purposes of argument that Order 1000 and FERC's approval of the MISO tariff are valid. Yep. We've got then pretty explicit federal approval of compliance with such a state law. There was no response in your brief to the White and Marion cases. I was wondering if you wanted to address them. Sure. I mean, as was pointed out, they predate what the Supreme Court more recently said, which is that there is not any authorization in the Federal Power Act for states to overtly discriminate against interstate commerce. And I don't see how, if Congress hasn't authorized it at all, I don't see how you can read into a statute that didn't authorize it some sort of implicit power for an agency to authorize what Congress itself has not authorized. And I would note that this court's decision in the EPSA versus Starr case that was cited earlier, the other side wants to quote the first line where the court said it matters that there's power here, but the court then promptly goes on to say that A24B1, the very provision we're talking about here is that they're saying authorizes discrimination, quote, does not authorize expressed discrimination. EPSA versus Starr was a pike balancing case, and this court said that while A21B1 alters the calculus for a pike balancing claim, it does not authorize expressed discrimination, which of course this court had to say, because that is the square holding of the Supreme Court, both in the New England Power Company case and in the Wyoming versus Oklahoma case. And so I don't see how, when the court has said Congress has not blessed this, that you could read into the statute an implicit empowerment of FERC to sanction discrimination, but ultimately it doesn't matter because this court asked for FERC's views and FERC provided them, and they said, we don't take a position on the dormant commerce clause issue, and we've never taken one. The question before FERC is not constitutionality. The question is policy, right? Sure. And they said as a matter of policy, it's okay with us for states to put these rights of first refusal in place pending further contemplation, discussion, and decision. Pending further contemplation, discussion, and decision, including litigation over their constitutionality. And if you go back to Commissioner Bay's separate statement in the Order 1000 proceedings, he specifically said, by virtue of just saying that these laws can be applied if they are applicable, we aren't trying to preempt questions about whether they violate the dormant commerce clause. We are not the right forum to adjudicate disputes about whether they violate the dormant commerce clause, which goes to show why it really makes no sense that appellants are saying what we need to do is go adjudicate before FERC in an action against MISO whether Indiana's law violates the commerce clause. FERC has already said, we're not a body who can answer that question. They will simply say, we don't take a position on that question. We don't have the power to adjudicate the constitutional question of whether a state law violates the commerce clause. And so we'll just end up right back where we are right now, which is in actual litigation before an Article III court. What's your understanding about the point that Ms. Lawrence was making about, at the end of the day, final judgment, fast forward the litigation, that the Indiana Commission, the Regulatory Commission, is really not the proper body, that this is more at a local level. So Allen County or Marion County or some of the county folks. Yeah, I don't think that makes any sense. I mean, I want to be clear. The notion that the Commission doesn't enforce this law is refuted by Indiana law itself. Indiana Code 8-1-2-115 explicitly charges the IURC with enforcing the entire body of public utility laws, which includes HEA 1420. And HEA 1420, on its face, contemplates enforcement roles for the Commission. You shall submit your notice to the Commission. Doing so, that's not just so they have a piece of paper they can throw away. It triggers an obligation that you then shall submit to the Commission information in a form prescribed by the Commission, a form and manner prescribed by them, information about the project, the nature of it, the need for it, the costs of the project, and the reason the Commission wants that information is because the Commission, at the end of the day, is responsible for accounting for the costs that an incumbent incurs in constructing a project when it sets the rates for the retail customers in Indiana. So the part of this project, you know, these are interstate projects, so their costs are allocated all throughout the MISO region, but the costs that are allocated to Indiana, the Commission is the entity that ultimately, through its rate regulation at the retail level, allows those costs to be passed down. So they want this information because that's their job. There's also an obligation in the statute that incumbents put certain aspects of the projects out for competition. There's no one who can enforce that other than the Commission. It's charged with enforcing the statute. So there's all sorts of things the Commission does to enforce the statute. I can't get my head around a world where, hypothetically, we're nowhere near there, that there is a hypothetical final judgment declaring the Indiana statute unconstitutional, and the Regulatory Commission says, well, one, we don't care, and two, we're treating it as effectively grandfathered based upon some preliminary phase of the litigation where MISO did what it did. I don't even know what the Indiana statute means then. I think that goes, I mean, you know, it goes a long way to show you. I mean, they never say it that bluntly, and I totally get that they show courts respect and they plan to follow court orders. I get all that. But to say they have no enforcement authority, I don't know what the Indiana statute means. Well, if nothing else, I'm not really sure how they're going to allow cost recovery under a statute that they've now been told is unconstitutional. I mean, all that seems very problematic to me. But I think the whole reason that they're kind of, you know, stuck talking a little bit out of both sides of their mouth is because this statute, they're ultimately trying to control MISO. What they want is for their law to exist and force MISO to assign the projects in a particular way. But they also at the same time acknowledge that they don't have direct regulatory authority over MISO. And so what, you know, I think what would probably play out in a lot of these hypotheticals that were provided by your honors is if there was kind of a dispute about what to do with a project, it's probably going to get brought before FERC. The IRC could bring it before FERC. We could bring it before FERC. You know, an incumbent brings it before FERC. Anybody brings it before FERC. And a lot of it ends up getting sorted out there. But, and I think it is fair to say, you know, FERC has really a primary role. It is hard to envision as we sit here. We're not FERC to be certain. But it is hard to envision FERC adjudicating a Dormant Commerce Clause case to finality. Oh, and they're not going to.  They are not going to. All I meant, what would go before FERC is the question of what should we do in light of the Dormant Commerce Clause judgment that was entered by a federal court. And it seems to me FERC, Judge Hamilton has captured it perfectly in my view. FERC is, we know what FERC's policy position is. It's either blessed, tolerated, accepted, acquiesced in state law rights of first refusal. But it has not ever taken the position that it would allow RTOs and ISOs to continue following them if they are unconstitutional. No, hence this litigation. Right. And so I think if we got a final judgment from this court, I mean we think the same thing should happen with a preliminary injunction. That's just a dispute. But what would, the debate that would then go on before FERC, this is kind of what happened in the context of the Iowa litigation. Then you go to FERC and FERC has to resolve, are we going to reassign the project? If we do reassign the project, are we going to allow the party who incurred costs while the law was different to recover those costs? There's mechanisms to deal with all of that because this isn't the only scenario in which projects are ever approved or assigned and then later don't happen. So you deal with all of that through procedures before FERC. And I think all that would get sorted out on the back end. But to try to go to FERC first and say, hey, you know, we think one day this law might be held unconstitutional. So we want you to resolve all the disputes about how you would act if it were. I think FERC would say, what are you talking about? Get out of here. Come back to us after you've literally answered the question. You made FERC's brief as trying to hint what it ultimately thinks, particularly toward the end. And are you concerned that it's the self-same administration, at least then, that filed the brief, the Office of Solicitor General filed the brief in the Fifth Circuit litigation expressly taking a position against the constitutionality? Or you're not bothered by that at all because, admittedly, that Texas statute is so different from the Indian statute here? Oh, no, no, no. We don't think it's different at all and that the position is any different. I take FERC at its word on page 11 of its brief where FERC said, and I quote, that it has not previously taken a position on the constitutionality of row for loss. And it said it was not taking one in this litigation either. It said that very, very clearly on page 11 of its brief. But is that hard to take with a straight face? Oh, I think it would be. When we know what the Solicitor General said in the next era. Sure. I mean, I think, you know, to me it's very interesting that FERC says that and then says in the next breath, to be clear, we have to admit that the United States has taken the position that these violate the Dormant Commerce Clause. Or at least that they are discriminatory under the Dormant Commerce Clause, which the Solicitor General clearly took that position. And to be clear, the Solicitor General in both the Biden administration and in the Trump administration took that position because the United States, I'm sorry, the United States took that position. The United States filed a brief in support of our challenge in the Eighth Circuit litigation during the previous administration. So the United States is on record repeatedly as saying that these laws are discriminatory for purposes of the Dormant Commerce Clause and it has never suggested that FERC somehow has the power to let states enact them anyway. So FERC, I appreciate that FERC doesn't want to take any position on this and I appreciate FERC saying, you know, we're not an Article III court. It's not our position to decide, our role to decide what does and doesn't violate the Dormant Commerce Clause. And I think you should take their brief at face value that it is not intended to speak to anything other than their views about preemption, which as I noted is really not before the court in the present posture that we're in right now. This does seem sort of upside down to me with respect to Dormant Commerce Clause jurisprudence, right? Because as one of our colleagues has pointed out, the Dormant Commerce Clause doesn't actually exist in the text of the Constitution. But it has been implied to protect federal power over economic policy understood broadly, right, from state interference. And it's well understood that the federal government can choose to bless policies that would otherwise violate the Dormant Commerce Clause. We have White, we have Marion, we have a host of other fields. We have more explicit congressional approval, take McCarran-Ferguson with insurance, for example. So I understand that FERC doesn't want to decide constitutionality, but it does decide federal policy in this area, consistent with what's delegated to it from Congress. Well, and that's, therein lies the rub. FERC has to have been delegated the power to authorize states to enact laws that violate the Dormant Commerce Clause. And that's not, that is a power that I think the only sensible way to think about it is if Congress wants to delegate that power, it needs to do so in every bit as clear of a statement as it would need to. In Wyoming, had FERC approved of that? I don't know if FERC had played in on any of it there. I have no indication that it did. You know, I don't think, I mean, I think it's fair to say the court wasn't specifically confronting the question of whether, you know, it made a difference if FERC had said something's okay. But I really don't see how. It just, it seems to follow naturally from the proposition that Congress has to explicitly authorize states to engage in violations of the, what would otherwise violate the Dormant Commerce Clause, that I think for Congress to delegate that power to an agency, it would have to do so in clear terms. It would have to say to FERC, you may decide, you know, that states may or may not have laws that discriminate against the Dormant Commerce Clause. And nobody is claiming that Congress has ever clearly delegated to FERC  So before Order 1000 then, when all states, when these sorts of rights of first refusal applied to everybody, was that unconstitutional? No, because they applied by as a matter of federal law. And, I mean, you could argue. But you're saying they didn't have the authority to do that. No, no, no. They're two different questions. One is whether FERC has the authority under the Federal Power Act to have a right of first refusal. We argued before this court that they, we made arguments about their authority as a general matter. But when FERC itself puts in place a ROFR, FERC is not a state actor. So it is not bound by the Dormant Commerce Clause. That is quite different from saying that FERC has been given the power to authorize states to enact laws that violate the Constitution. So we can certainly have a debate about whether FERC is within FERC's authority under the Federal Power Act, just like as a matter of delegation, whether it can or can't have ROFRs. But whether FERC can authorize a state to enact an otherwise unconstitutional law is a completely different question. And I think that's really what the court was getting at, just from a little bit different lens, in Wyoming and New England Power, when it said, look, we appreciate that these laws aren't preempted, that the states have been reserved the authority to enact under the Federal Power Act the laws that were at issue in New England Power and in Wyoming. But the court said that is not the same question as whether the laws violate the Dormant Commerce Clause. Same thing, you know, if you take it up a level to FERC. Whether FERC can do it itself is different from whether FERC can authorize a state to do it. And FERC does not claim to have authorized states to enact these laws if they are unconstitutional. It only says we haven't preempted them, but we've expressed no view on whether they actually are consistent with the Dormant Commerce Clause. And I think that really just kills their argument that all of this is somehow authorized and you can avoid the Dormant Commerce Clause issue entirely, because FERC is telling you, no, no, we didn't touch that because we know that that's your purview. And, of course, you know, we think the district court knows exactly what the merits. Do you think HUD or the Department of Interior and White and Marion made a decision about constitutionality, or did they just decide this is fine? The tax or the local hiring requirement? It's a little bit unclear what they were thinking and doing there, but, you know, I think what HUD can do under HUD's statutory authority is a little bit different from a case in which you're dealing with a statute that the Supreme Court has already interpreted squarely, the very provision we're talking about here, as not empowering states to violate the Dormant Commerce Clause. So, to me, to read into the statute that the court has said Congress didn't intend to authorize states to do this, that Congress actually intended to empower FERC to do it, just really doesn't seem right at all. And I think it's notable that FERC did not take up that charge and argue in its brief that we think that all of this is okay even if it does violate the Dormant Commerce Clause because we've said it's totally fine for purposes of both preemption and Dormant Commerce Clause. They treated the issues as distinct, and their orders, Order No. 1000, doesn't say anything about it. The discussion about the Dormant Commerce Clause comes only in the separate writing from Commissioner Bay, who I think was actually Chair Bay at the time, saying we are not addressing that question. So even if FERC had this authority, FERC doesn't claim to have exercised it. And I don't think that you could kind of implicitly attribute to FERC something that it is explicitly telling this court it did not intend to do. I would like to just close by saying I really do think all of this, it's interesting that so much has focused here on the threshold issues. I know they are difficult threshold issues, and this is a complicated case with a complicated situation. But it does seem like nobody here wants to talk about the merits, and I think that's because the District Court was just very clearly right under clearly established Supreme Court precedent. There may be many who don't agree with the Supreme Court's precedent on aspects of the Dormant Commerce Clause, but we have here a statute that on its face grants preferences on the basis of in-state presence. That is not something that Congress has authorized. It is not something that Tracy authorizes. The Sixth Circuit just joined the multiple circuits now that have said that Tracy does not create some special exemption for any and all laws that offer some sort of preference to vertically integrated utilities. Even if Tracy did, this law doesn't fit that mold because this law offers preferences on the basis of whether you have an in-state presence in Indiana, even if you are not a vertically integrated utility like Republic Transmission, which gets all the same rights just by virtue of having, I mean much more limited in practice because we only own a couple of lines, but the same legal rights just by virtue of having a presence here. So this law just really, I think the District Court got it exactly right on the merits in terms of there being discrimination. No one's even tried to argue that this law could satisfy strict scrutiny and the arguments that is exempt from Dormant Commerce Clause scrutiny just fail under pretty settled Supreme Court precedent and decisions from most of the courts of appeals. So I think this really then all comes down to this dispute about whether we've sued the right parties and sought relief that will actually get us what we want. And on that, I would make a practical point, which is if this injunction really had no force and didn't do anything and wasn't giving us anything, I don't know why we'd be here. I mean, we're not the appellants. We're the athletes. We got the injunction. They have brought an appeal asking this court to vacate it. They don't want it on the books because they know it presents a threat to them because we can go to FERC and argue to FERC that MISO misinterpreted its tariff and that this law was not enforced at the relevant time and is not enforced now, and so it's not applicable for purposes of the tariff and the projects need to be set out for competition. If nobody thought that was even a remote possibility here, I don't think they'd be wasting this court's time with this appeal. They came in and said, we need this injunction gone because we're worried about the real-world effect and the relief that it may ultimately give my clients. And we think that it's only fair under those circumstances for purposes of all the threshold arguments to appreciate what this court said in cases like the Trump case that we cited in our supplemental filing on Friday. This is one of the obstacles to our ultimate effort of trying to get to compete is the existence of this statute, and this injunction removes that obstacle by saying this statute is not enforceable. Yes, we now have another obstacle. We need to go adjudicate before FERC the question of how to interpret MISO's tariff, but if you took the injunction away just because it doesn't get rid of both obstacles, you'd really be preempting the right of FERC to adjudicate in the first instance that dispute about what force a preliminary injunction has for purposes of the applicable laws provision of the tariff. Unless the court has any other questions, we'd ask you to affirm. Ms. Murphy, thanks to you. Okay, Mr. Saitlin. Thank you. First, who enforces this law? That is a question of a little higher level generality. Who enforces the aspects here that they claim harm them? It is unquestionably that it's only MISO. The thing that they say harmed them is the assignment of the project without competitive bidding. Only MISO does that. My friend conceded that, made a 3732 of the oral argument the last time, asked the court to take a look at that. Since MISO is the only entity that enforces that, MISO is the only proper defendant. I saw a little bit of struggle here about maybe we can't bring that lawsuit in federal court, maybe we've got to go to FERC. Well, you know, the whole women's health case versus Jackson County Supreme Court deals with that. If there is frustration that there's not enough proper parties, there's not the most convenient proper party, Article III of the Constitution of the United States says too bad, so sad. You cannot sue a party that has no authority to redress your harms, that has not caused your injury, even if it causes some difficulties. Now, we believe that if they would just change this threatened petition, the complaint they're going to file with FERC to add a dormant commerce clause claim, FERC would adjudicate that as it did in the Power-X case that's cited in the Utilities Amicus Brief. FERC adjudicated on the merits, dormant commerce clause claim, and other constitutional claims. If we're wrong about that, then they can take that up on petition to review to this court and the D.C. Circuit. What they can't do is, and I take it that it's pretty clear that the preliminary injunction is out because of the MISO Amicus Brief, but even on the more fundamental Article III standing issue that would lead to whether they're going to be proceeding in the district court, Article III says you've got to sue the right party. They have conceded that the only party that enforces the aspect of this that harms them is MISO. Therefore, they've just got to sue MISO, and if that has to be in FERC, then so be it. It certainly can't be in an Article III court in the first instance. Finally, on the implied dormant commerce clause, they are really pitching a very bizarre version of the dormant commerce clause where my friend conceded that FERC can put in roofers to its heart's delight, but if FERC decides to be a little bit more modest and said we're going to honor a roofer, but only if the state wants it, and to create a modest regime, that that creates some sort of a bizarre, perverse trapdoor that because FERC tried to do this thing, tried to be more accommodating, then all of the, every roofer is gone, and every state has to be in competitive bidding. That would be a very bizarre interpretation of the dormant commerce clause. Thank you. Okay. Thanks to you. Thanks to all parties. We appreciate it very much, and the court will take the two appeals under advisement. We stand in recess.